UNITED STATES of America, Appellee,

v.

Leonard PELTIER, Appellant.

No. 77–1487.

United States Court of Appeals,
Eighth Circuit.

Submitted April 12, 1978.

Decided Sept. 14, 1978.

As Modified on Denial of Rehearing and Rehearing En Banc Oct. 27, 1978.

William M. Kunstler, New York City (argued), and Michael E. Tigar, Washington, D. C. (argued), Arthur Kinoy, New York City, on brief for appellant.

Evan L. Hultman (former U. S. Atty.), Waterloo, Iowa (argued), Lynn E. Crooks, Asst. U. S. Atty., Fargo, N. D., Robert L. Sikma, Asst. U. S. Atty., Sioux City, Iowa, and Richard E. Vosepka, Jr., Asst. U. S. Atty., Minneapolis, Minn., on brief for appellee.

Before GIBSON, Chief Judge, and ROSS and STEPHENSON, Circuit Judges.*

* This appeal was originally submitted to a panel of Judges Ross, Stephenson and Webster. Upon Judge Webster's resignation from the court, the appeal was resubmitted to Chief Judge Gibson, and Judges Ross and Stephenson.

ROSS, Circuit Judge.

On June 26, 1975, two Special Agents of the Federal Bureau of Investigation, Jack Coler and Ronald Williams, were murdered on the Pine Ridge Indian Reservation in South Dakota. Leonard Peltier, Robert Eugene Robideau, Darrell Dean Butler, and James Theodore Eagle were charged with the murders in a two-count indictment for first-degree murder in violation of 18 U.S.C. §§ 2, 1111, and 1114. Robideau and Butler were jointly tried by a jury and were acquitted. The government dismissed the charges against Eagle. Subsequent to the Robideau-Butler trial, Peltier was tried by a jury, was convicted on both counts, and was sentenced to life imprisonment on each count, the sentences to run consecutively. He appeals.

Peltier was not a permanent resident of the Pine Ridge Reservation. His presence there in June of 1975 was the result of a political struggle between certain reservation members who supported the structure of tribal government, and supporters of the American Indian Movement (AIM) who advocated a different form of government. In an effort to alleviate the conflict, tribal elders had invited members of AIM to stay at the reservation. Leonard Peltier, Darrell Butler, Robert Robideau, Michael Anderson, Wilford Draper, Norman Charles, Norman Brown, and Joe Stuntz, all AIM members, accepted their invitation. They arrived in the spring of 1975 and stayed in an encampment on the reservation which became known as "Tent City."

In June of 1975, Special Agents Coler and Williams were engaged in felony criminal investigations on the Pine Ridge Indian Reservation. On June 25 and 26, they were attempting to locate and arrest four individuals, including James Theodore Eagle, who were charged with armed robbery and assault with a deadly weapon.

Shortly before noon on June 26, Special Agent Williams, driving a 1972 Rambler, and Special Agent Coler, driving a 1972 Chevrolet, entered the Harry Jumping Bull Compound on the reservation.[1] The agents were following three individuals riding in a red and white van that had entered the compound shortly before them.[2] The van stopped at a fork in the road leading to Tent City. The agents stopped at the bottom of a hill. Williams advised Coler on the radio that the occupants of the van were about to fire on them. Firing commenced. Other AIM members who were present at the Jumping Bull Compound or Tent City thereafter joined in the shooting.

The agents took heavy fire. Over 125 bullet holes were found in their cars. In contrast, only five shell casings attributable to the agents' guns were ever found at the scene. Both agents were wounded by bullets fired from a distance. Special Agent Coler was wounded by a bullet that traveled through the trunk lid of his car and struck his right arm. The force of the bullet almost took his arm off, rendering him completely disabled and causing him to lose blood rapidly. He crawled to the left side of his car, away from the gunfire. Williams was shot in the left shoulder. The bullet traveled from his shoulder, under his arm and into his side. Although wounded, Williams removed his shirt and attempted to make a tourniquet for Coler's arm. Williams at some point was also shot in the right foot.

These wounds were not fatal. The agents were killed with a high velocity, small caliber weapon fired at point blank range. Williams attempted to shield his face from the blast with his right hand, turning his head slightly to the right. The murderer placed the barrel of his gun against Williams' hand and fired. The bullet ripped through Williams' hand, into his

---

1. The compound consists of a number of houses and buildings, and is located a short distance off Highway 18 between Oglala and Pine Ridge, South Dakota. It is approximately a quarter of a mile northwest of Tent City.

2. The agents had been told that Eagle might be riding in a red vehicle.

face, and carried away the back of his head. He was killed instantly. The murderer shot Coler, who was unconscious, across the top of the head. The bullet carried away a part of his forehead at the hairline. The shot was not fatal, however. The murderer then lowered his rifle a few inches and shot Coler through the jaw. The shell exploded inside his head, killing him instantly.

■ The evidence against Peltier was primarily circumstantial. Viewed in the light most favorable to the government,[3] the strongest evidence that Peltier committed or aided and abetted the murders is as follows:

1. The van that the agents followed into the Jumping Bull Compound was occupied by Peltier, Norman Charles and Joseph Stuntz.

2. At the time, Peltier had access to information that he was being followed by FBI agents. One of the occupants of the van, Norman Charles, had been picked up along with two other AIM members, Anderson and Draper, by Coler and Williams the day before. The three had been transported to Pine Ridge in Williams' car, and were later released after the agents were informed that none of them was Jimmy Eagle.

3. Peltier had reason to believe that the agents were looking for him, rather than Jimmy Eagle. He stipulated at trial that there was an arrest warrant outstanding, charging him with attempted murder. Upon his arrest in Canada months later for the murders of the agents, Peltier remarked that the two agents were shot when they came to arrest him. He also made other incriminating statements.

4. Michael Anderson, one of the AIM members who was firing at the cars from one of the houses in the Jumping Bull Compound, testified that after both sides had been shooting at one another from a distance, and at least one of the agents had been wounded, he saw Peltier, Robideau and Butler standing down at the agents' cars. Peltier at the time was holding an AR–15. Shortly after he saw the three down at the agents' cars, he began to walk back to Tent City, a distance of about a quarter of a mile. When he arrived at Tent City, Peltier, Robideau and Butler were already there, as was Williams' car. F.B.I. agents who later searched the area recovered Williams' badge and billfold on the ground near the junction of the roads leading to the houses and Tent City. It was at this junction that Peltier's van had stopped shortly before the firing commenced.

5. According to the doctor who performed the autopsies, the agents were shot with a high velocity, small caliber weapon. Peltier's AR–15, the civilian counterpart of the M–16, was the highest velocity weapon fired that day.[4] No other person was seen by any trial witness on June 26 with an AR–15. Peltier carried his AR–15 out with him when he and the other participants of the shootout escaped from the reservation and fled to the Rosebud Reservation, where they remained for some time before splitting up. Robideau, Charles and Anderson went south after leaving Rosebud. Anderson testified that he loaded their car with weapons, one of which was an AR–15, before they left South Dakota. On

---

3. " 'The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.' " *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974), *quoting Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). As we pointed out in *United States v. Lambros*, 564 F.2d 26, 28 (8th Cir.), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1977), the same standard of review applies in cases where the conviction rests on circumstantial evidence, because circumstantial evidence is equally as probative of guilt as direct evidence.

4. When seen standing at the cars, Peltier carried an AR–15 and Butler an M–1. Robideau had been seen on various occasions carrying a Commando Mark III, a .45 caliber semiautomatic weapon. The velocity of a commercially loaded .223 caliber cartridge fired from an AR–15 is 3200 feet/second, a .30/06 caliber cartridge fired from an M–1, 2700 feet/second, and a .45 caliber cartridge fired from a Commando Mark III over 1000 feet/second.

September 10, 1975, the car exploded on the Kansas Turnpike, and police recovered from the car the AR–15 which the government contended Peltier used on the day of the murders.

6. Ammunition components linked ballistically to the same AR–15 were found at the crime scene. The ballistics expert was unable to fire the AR–15 because it had been damaged in the explosion on the Kansas Turnpike. However, he was able to remove the bolt from it, place the bolt in another AR–15, and test fire the replacement AR–15. The expert testified that a .223 cartridge casing found in the trunk of Coler's car had been loaded into and extracted from the AR–15. He also testified that a .22 caliber copper bullet jacket found in the ground underneath the bodies of Coler and Williams had rifling impressions consistent with the rifling of the barrel of an AR–15. There was no testimony to indicate that either Robideau or Butler was seen the afternoon of the murders with a weapon that fired .22 caliber bullets.

7. Wilford Draper, a member of the escape party that left Tent City the evening of the murders, testified that he overheard Peltier, Butler and Robideau discussing certain details of the murders on the evening of June 26, 1975.

8. Peltier was stopped by police months later in the State of Oregon. He fled the scene, turning to fire on one of the police officers. The motor home in which he was riding was searched, and Special Agent Coler's revolver was found in a bag bearing Peltier's thumbprint.

■ After a twenty-five day trial, Peltier was convicted by a jury of both counts of first-degree murder. He alleges on appeal [5] that:

1. Certain evidence introduced at trial was so prejudicial and inflammatory that its admission constituted a denial of due process;

2. The trial court refused to instruct the jury on his defense that he was a victim of an F.B.I. frame-up, and refused to allow him to introduce much of the available evidence of F.B.I. misconduct, thereby depriving him of a fair trial and of his right to compulsory process;

3. The trial court's refusal to reread testimony requested by the jury constituted an abuse of discretion;

4. The trial court had no jurisdiction to try him because the United States Government deliberately violated the Webster-Ashburton Treaty;

5. Prosecution is barred by the doctrine of collateral estoppel.

We affirm.

## I

*Admission of Flight, Other Crimes, and Weapons Evidence*

In proving its case against Peltier, the government was required to introduce a great deal of evidence regarding the firearms used by the participants of the shootout, the firearms recovered upon a search of Tent City shortly after the murders, and the various ammunition components recovered upon a search of the entire crime scene shortly after the murders. Since the case against Peltier was circumstantial, the evi-

---

**5.** The appellate attorneys also seem to be raising a question of the competency of trial counsel. Peltier was initially represented on appeal by his trial attorneys, who filed a brief on his behalf. On November 2, 1977, this court permitted new counsel to enter the case. Peltier's second set of attorneys, in oral argument, argued that Peltier's trial attorneys should have called F.B.I. Director Clarence Kelley as a witness for the defense, and that their failure to do so was prejudicial to Peltier. We carefully examined the record in the trial court and on appeal, and have concluded that the defendant's trial counsel were aggressive, capable,

and informed, and engaged in sophisticated trial decisions on strategy. Their decision not to call Clarence Kelley, who did testify in the Butler-Robideau trial, was clearly such a tactical decision. We have read the transcript of Kelley's testimony at the Butler-Robideau trial, and find that its relevance to Peltier's trial was highly doubtful. The allegation of Peltier's counsel on appeal amounts to no more than hindsight and second-guessing by one lawyer concerning trial tactics used by another lawyer. Peltier was equally well-represented at trial and on appeal.

dence was necessary to negate the participation in the actual murders by others who were present.

In the course of introducing this evidence, the government offered evidence which the defendant describes as inadmissible other crimes and weapons evidence. Most of this evidence related to the circumstances surrounding the discovery of the admittedly relevant firearms evidence described above. Defendant complains of the admission of this evidence, even though much of it was admitted without objection.

## A. Other Crimes Evidence

The admissibility of other crimes evidence is governed by Fed.R.Evid. 404(b), which provides:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have held that evidence of other crimes, wrongs, or acts that is vague and speculative is not admissible under Rule 404(b). *United States v. Jones*, 570 F.2d 765, 768 (8th Cir. 1978); *United States v. Maestas*, 554 F.2d 834, 837 n.2 (8th Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977). Furthermore, an issue on which other crimes evidence is admissible must be raised at trial. *United States v. Adcock*, 558 F.2d 397, 402 (8th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); *United States v. Maestas, supra*, 554 F.2d at 837; *United States v. Clemons*, 503 F.2d 486, 489 (8th Cir. 1974).

Evidence that is admissible under the terms of Rule 404(b) may nevertheless be excluded under the provisions of Fed.R. Evid. 403, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

■ In reviewing a discretionary decision to admit evidence under Rule 403, we give great deference to the trial judge who saw and heard the evidence. *United States v. Bohr*, 581 F.2d 1294, at 1298–1299 (8th Cir. 1978); *United States v. Weir*, 575 F.2d 668, 670 (8th Cir. 1978); *United States v. Matlock*, 558 F.2d 1328, 1332 (8th Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 218, 54 L.Ed.2d 152 (1977); *United States v. Maestas, supra*, 554 F.2d at 836.

We will discuss each claim of erroneously admitted evidence separately.

### 1. Milwaukee, Wisconsin Incident

■ At the trial, the parties stipulated to the following facts: On November 22, 1972, Peltier was charged with attempted murder in Milwaukee, Wisconsin. He was arrested, pleaded not guilty, and was released on bond. On July 29, 1974, he failed to appear for trial on the charge, his bond was forfeited, and a bench warrant was issued for his arrest. Peltier was aware of the outstanding arrest warrant for attempted murder and knew that if he were taken into custody by law enforcement officials, he would be returned to Milwaukee to stand trial.

The defendant agreed to stipulate to these facts only after the district court rejected his argument that they were not relevant. The government argues that this evidence was admissible under Rule 404(b) to prove motive, because it tended to show why Peltier reacted with deadly force when followed by the F.B.I. agents. We agree. The key issue at trial was the identity of the murderer, and evidence tending to show motive was clearly relevant. *United States v. Stover*, 565 F.2d 1010, 1013 (8th Cir. 1977); *Gregory v. United States*, 365 F.2d 203, 205 (8th Cir. 1966), *cert. denied*, 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676 (1967).

Moreover, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, as is contended by Peltier on appeal. The evidence

was highly probative, especially when considered in conjunction with a statement Peltier made after his arrest in Canada to the effect that the two agents were shot when they came to serve him with a Wisconsin warrant. Furthermore, the government took steps to minimize the danger of unfair prejudice. The fact that the person Peltier allegedly assaulted in Wisconsin was an off-duty police officer was withheld from the jury. The stipulation was read to the jury at the end of the government's case. Finally, the following cautionary instruction was given:

Evidence has been admitted relating to other crimes, wrongs or actions alleged to have been committed by the defendant in this case. Such evidence is not to be considered to prove the character of the defendant in order to show that he acted in conformity therewith on June 26, 1975.

Evidence of a charge against the defendant in Wisconsin and his alleged flight to avoid trial was introduced to show a possible motive the defendant may have had to avoid apprehension on June 26, 1975. The defendant is presumed to be innocent of the Wisconsin charge and the evidence relating to that charge must be considered by the jury only on the issue of motive.

We hold that the district court did not abuse its discretion in admitting this evidence.[6]

## 2. Ontario, Oregon

On November 14, 1975, Oregon State Police stopped two vehicles near Ontario, Oregon: a motor home and a Plymouth station wagon. Peltier was one of the occupants of the motor home, and fled the scene, turning to fire at the state trooper. Upon searching both vehicles, Oregon authorities recovered from the motor home Special Agent Coler's revolver in a paper bag bearing Pel-

tier's thumbprint, and from the station wagon several shell casings that had been fired from Coler's revolver.

The defendant alleges error in the admission of much of the "other crimes" evidence offered by the government relating to the Oregon incident.

### a. Evidence of flight

In addition to the testimony that Peltier fled the scene, turning to fire at the arresting officer, the government introduced testimony that the following items were recovered upon a search of the vehicle:

 i. fourteen firearms, eight of which had obliterated serial numbers, and numerous boxes of shells;

 ii. tool boxes containing wiring, pocket watches with wires leading out of them, tools, pliers, and empty shell casings;

 iii. pieces of paper in each vehicle upon which were written code numbers and words as follows: # 510—bomb; # 54—pigs; # 527—ammo; # 529—cops; # 528—dynamite; # 524—roadblock. Both vehicles were equipped with CB radios, and the motor home was equipped with a scanner to pick up other frequencies;

 iv. nine hand grenades.

In addition to the testimony, pictures of most of the items described in (i), (ii), and (iv) and the pieces of paper described in (iii) were also admitted into evidence.

 The defendant objected to the admissibility of much of this evidence; the government contends that it was properly admitted as evidence of flight. It is well settled that flight of the accused subsequent to the commission of a crime is, in certain instances, "a circumstance proper to be laid before the jury as having a tendency to prove his guilt." *Allen v. United States,*

---

**6.** Subsequent to the trial in the instant case, Peltier was tried and acquitted of the charge of attempted murder of a police officer in Milwaukee, Wisconsin. He now argues that his acquittal dramatically illustrates the lack of probative value of the evidence. We disagree. The evidence is probative of Peltier's state of

mind on the day of the murders. That state of mind was not affected by the disposition of the charge subsequent to the murders. Furthermore, the cautionary instruction adequately cured any unfair prejudice which could have arisen from the jury's knowledge of the pending assault charge.

164 U.S. 492, 499, 17 S.Ct. 154, 41 L.Ed. 528 (1896). *Accord, United States v. White,* 488 F.2d 660, 662 (8th Cir. 1973), and cases cited therein. However, in the face of Supreme Court decisions expressing doubt as to the probative value of flight, *see Wong Sun v. United States,* 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Alberty v. United States,* 162 U.S. 499, 511, 16 S.Ct. 864, 40 L.Ed. 1051 (1896); *Hickory v. United States,* 160 U.S. 408, 418, 16 S.Ct. 327, 40 L.Ed. 474 (1896), the lower courts have generally scrutinized the facts of each case to determine whether the jury should be given the opportunity to draw an inference of guilt from a defendant's flight.

The probative value of flight evidence has recently been analyzed in *United States v. Myers,* 550 F.2d 1036, 1049 (5th Cir. 1977). There the court held that the probative value of flight as circumstantial evidence of guilt

> depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

The validity of drawing these inferences in turn depends upon the number of evidentiary manifestations suggesting defendant's decision to flee was prompted by considerations related to the crime in question. As the court stated in *Bailey v. United States,* 135 U.S.App.D.C. 95, 416 F.2d 1110, 1115 (1969), "guilt, as a factual deduction, must be predicated upon a firmer foundation than a combination of unelucidated presence and unelucidated flight."

We hold that there was a sufficient number of such evidentiary manifestations to make evidence of flight and of resistance to arrest [7] highly probative of consciousness of guilt, and hence guilt itself in this instance. First, Peltier fled the scene of the crime immediately after its commission. His actions in Oregon were a continuation of that immediate flight. Second, the fact that the motor home and station wagon were traveling arsenals linked by communication devices and code words designed for avoidance of arrest was significant evidence of Peltier's state of mind. Finally, and most important, evidence linking Peltier to the murders was discovered upon a search of the vehicle from which he fled. The presence in the motor home of Agent Coler's revolver, in a bag having Peltier's thumbprint on it, was one of the key pieces of evidence against Peltier. Under these circumstances, we find that the evidence of flight was highly probative.

Peltier argues that the evidence of flight was inadmissible because it did not relate to flight occurring immediately after the murders, and because the government did not show that at the time of the flight in Oregon, the defendant had been charged with, or knew he was being sought for, the murder of the two agents.[8] In support of his argument, he cites *United States v. White, supra,* 488 F.2d 660, and *United States v. Jackson,* 572 F.2d 636 (7th Cir. 1978).

In *United States v. White, supra,* 488 F.2d at 662, the defendant fled from police attempting to arrest him for an incident that had occurred over five months. previously. There was no evidence that at the time of the flight he knew he was being sought for the crime charged. We held in the context of that case that admission of the evidence of flight and the giving of a

---

7. Evidence that the defendant resisted arrest is similarly admissible as showing consciousness of guilt. *United States v. Graham,* 548 F.2d 1302, 1313 n.13 (8th Cir. 1977).

8. There was evidence that at the time of his arrest several months after the Oregon incident, Peltier was in fact aware that he was being sought for the murders of the two F.B.I.

agents. One of the officers who arrested Peltier in Canada testified that Peltier acknowledged he knew he was wanted for the murders. Peltier also stated he would have resisted arrest by deadly force if he had known the police officers were nearby, saying: "I have got nothing to lose * * * ."

flight instruction was not appropriate because evidence of flight was not sufficiently reliable as an indication of guilt. Within the framework of the *Myers* analysis, *United States v. Myers, supra,* 550 F.2d 1036, the evidence in *White* was simply too speculative to allow the jury to draw an inference of consciousness of guilt concerning the crime charged.

*White* does not require that where flight occurs a substantial time after the crime, evidence of that flight is properly admitted only if the government can prove with direct evidence that the defendant knows he is being sought for the crime charged. As the foregoing discussion indicates, there was sufficient circumstantial evidence that the defendant knew he was wanted for the murders of the F.B.I. agents.

■ Peltier also argues that, notwithstanding the relevance of the evidence, its probative value was substantially outweighed by the possibility of prejudice, and therefore it was inadmissible. We disagree. As we stated above, the evidence in this instance was highly probative. In the context of this case, the evidence did not prejudicially distort the general case against the defendant. As we related above, evidence pertaining to a great number of firearms and ammunition components was admitted as part of the government's case without objection by the defendant. The Pine Ridge shoot-out had many participants and there was no dispute as to the large number of firearms possessed by the AIM members. This additional firearms testimony could not have had nearly as strong an impact on the jury as in the cases cited by the defendant for the proposition that firearms evidence is highly prejudicial. *See, e. g., United States v. Robinson,* 560 F.2d 507, 513–14

(2d Cir. 1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); *United States v. Warledo,* 557 F.2d 721, 724–26 (10th Cir. 1977). Furthermore, the evidence was not presented in an inflammatory manner; in relation to the length of the trial, the time necessary for its presentation was brief. *See United States v. Maestas, supra,* 554 F.2d at 837 n.4. Finally, an elaborate cautionary instruction[9] was given, warning the jury against placing undue reliance on flight as evidence of guilt.

■ Finally, Peltier argues he offered to stipulate to his presence in Oregon and to the fact he was in flight, and that had the court accepted his offer to stipulate, other evidence of the Oregon incident would have been unnecessary. As a general rule, the government is not bound by the defendant's offer to stipulate. *United States v. Spletzer,* 535 F.2d 950, 955 (5th Cir. 1976); *United States v. Caldwell,* 148 U.S.App.D.C. 20, 46, n.134, 543 F.2d 1333, 1359 n.134 (1974); *United States v. Brickey,* 426 F.2d 680, 686 (8th Cir.), *cert. denied,* 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970). As stated long ago by the court in *Parr v. United States,* 255 F.2d 86, 88 (5th Cir.), *cert. denied,* 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958):

> The reason for the rule is to permit a party "to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight."

As the court pointed out in *United States v. Spletzer, supra,* 535 F.2d at 955, however, this rule is subject to the provisions of Fed.R.Evid. 403. The Advisory Committee in its notes accompanying Rule 403 suggested that:

---

**9.** The jury was instructed that:

The intentional flight or concealment of a defendant immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not of course sufficient in itself to establish his guilt; but is a fact which, if proved, may be considered by the jury in the light of all the other evidence in the case, in determining guilt or innocence. Whether or not evidence of flight or concealment shows a consciousness of guilt, and the

significance to be attached to any such evidence, are matters exclusively within the province of the jury.

In your consideration of the evidence of flight or concealment you should consider that there may be reasons for this which are fully consistent with innocence. These may include fear of being apprehended, unwillingness to confront the police, or reluctance to appear as a witness. Also, a sense of guilt does not necessarily reflect actual guilt.

In reaching a decision whether to exclude on grounds of unfair prejudice * * * [t]he availability of other means of proof may also be an appropriate factor.

As a general rule, trial courts should seriously consider offers to stipulate in deciding whether to exclude or admit evidence under Rule 403. *Cf. United States v. Cook*, 538 F.2d 1000, 1005 (3d Cir. 1976). After careful analysis, however, we conclude that the district court did not abuse its discretion in refusing to exclude the government's evidence relating to the Oregon incident merely because of defendant's offer to stipulate. The defendant never indicated a willingness to stipulate to any of the details of his flight, but only to the flight itself. Such a stipulation, barren of any detail, would have robbed the government of most of the probative value of the admissible flight evidence as tending to show consciousness of guilt of the murders.

■ If, in fact, the evidence of the weapons found in the Oregon incident was inadmissible, in view of all of the other weapons introduced into evidence without objection, the addition of these weapons was, in our opinion, harmless error beyond a reasonable doubt.

#### b. Unrelated robbery of ranch house

The government introduced testimony that on or about November 14, 1975, a .30/30 rifle and a pickup truck were stolen from a residence near Ontario, Oregon. Peltier's fingerprints were found in the residence. When Peltier was apprehended in Canada, he had in his possession the .30/30 rifle stolen from Oregon.

■ The government argues that this testimony was relevant to prove Peltier was indeed the person who fled from the motor home in Oregon and to show flight. Because Coler's revolver was found in the motor home, we agree evidence proving Peltier's presence there was relevant. We also agree that Peltier's actions of arming himself and stealing a vehicle for transportation were relevant to show continuing flight.

■ Peltier argues that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, especially in light of his willingness to admit his presence in Oregon. The other crimes evidence was not more highly probative of Peltier's presence in Oregon than his admission would have been, and the evidence of flight was essentially cumulative. Even if we held that the trial court abused its discretion in admitting this evidence, however, again we are convinced the error was harmless beyond a reasonable doubt. *United States v. Weir, supra*, 575 F.2d at 671. *See Harrington v. California*, 395 U.S. 250 (1969); *Chapman v. California*, 386 U.S. 18 (1967); Fed.R.Evid. 103. The evidence of Peltier's guilt was strong. The evidence in question was but a miniscule portion of the trial. Moreover, a cautionary instruction was given.[10]

### B. Weapons Evidence

The government, in addition to offering into evidence certain firearms that had been fired by various participants of the shoot-out at Pine Ridge, also introduced evidence relating to the circumstances surrounding the recovery of those firearms. Included in the government's presentation was evidence of other firearms and explosive devices. Peltier vigorously disputes the admissibility of this evidence, and argues that its prejudicial impact on the jury mandates reversal of his conviction.

#### 1. Wichita, Kansas

As we stated above, the escape party fled to the Rosebud Reservation after the murders and remained there for a time before

---

**10.** The jury was instructed that:

Evidence relating to the Oregon incidents and the defendant's alleged actions in connection with those incidents was also admitted for limited purposes. First, you may consider it insofar as you may find it relates to items of physical evidence that have been connected to the crime scene. Second, you may consider evidence of defendant's alleged actions in the Oregon incidents in determining whether he was in flight to avoid prosecution or for some other purpose.

splitting up. Robideau, Charles, and Anderson then proceeded south, and the car in which they were riding exploded on the Kansas Turnpike. Police recovered a large number of weapons and explosives from the car, including the AR–15 linked to the crime scene and Special Agent Coler's rifle. Peltier was not an occupant of the car and was not in the vicinity. Admitted into evidence were three of the firearms recovered at the scene of the explosion, several pictures of the explosion-damaged vehicle, several pictures of the eight or more firearms recovered from the vehicle, and several pictures of shells and of hand grenades found at the scene. Testimony of the details of the police search of the area and the discovery of the items admitted was heard by the jury.

In his brief, Peltier does not clearly articulate the specific evidence relating to the Wichita incident to which he objects. At trial, he objected to the relevance of the pictures of the vehicle after the explosion. We hold that the district court properly found the pictures to be relevant to explain the condition of the weapons introduced into evidence at the trial. A crucial question was whether the .223 casing found in Coler's trunk was fired from the AR–15 found in Wichita. The ballistics expert testified that he was unable to fire the weapon because of its condition. He was, however, able to remove the bolt, place it on another AR–15, and conduct limited comparisons.

Defendant also objected to the pictures of the hand grenades on the grounds of relevance and prejudicial impact. The government argued that the hand grenades found at Wichita were the type found at Tent City shortly after the murders, and that the pictures of the hand grenades found at Wichita were relevant to link the occupants of the vehicle to certain firearms found at the scene of Pine Ridge. We agree with the trial court that the pictures were relevant, and that their probative value was not substantially outweighed by the danger of unfair prejudice to the defendant. Both sides stipulated that Peltier was not present at Wichita at the time of the explosion. We do not agree that this evidence caused the jury to speculate about other bad acts attributable to him, as the defense contends.

Peltier argues generally that the introduction of firearms evidence was highly prejudicial. However, as we stated earlier, Peltier does not make clear which of the Wichita evidence he claims was erroneously admitted. He did object at trial to Ex. 34–A, the AR–15 found in burned condition at Wichita, as irrelevant. We hold that the district court did not err in finding that Ex. 34–A was relevant. The government contended that it was the AR–15 carried by Peltier at Pine Ridge on the day of the murders and offered ballistics evidence linking it to the murders.

At the trial, Peltier did not object when the testimony and pictures of the eight or more firearms recovered from the vehicle were introduced by the government. Nor did he object when Ex. 30–A, Special Agent Coler's .308 rifle or Ex. 30–1, a firearm found in burned condition at Wichita, were offered. He stipulated to the admissibility of Ex. 30–AA, a .308 rifle, as a replica of Agent Coler's .308 rifle when it was in good condition.

Even if we construed Peltier's brief on appeal to raise an objection to all of this evidence relating to the Wichita incident, we would hold that the admission of the evidence was not plain error. The circumstances of the recovery of the AR–15 and Coler's rifle were relevant. The firearms evidence could not be labeled highly inflammatory and prejudicial, in light of the wealth of firearms evidence admitted previously without objection. Moreover, Peltier was not present when the explosion and recovery of the firearms occurred.

Finally, Peltier offered to stipulate to the discovery of the AR–15 and Coler's rifle in Kansas. The government rejected the offer. As we held above, the government generally is not bound by an offer to stipulate, and we are not convinced that this evidence requires a different rule.

### 2. Rosebud

 On September 5, 1975, F.B.I. agents went to the Rosebud Indian Reservation, located about 180 miles east of the Pine Ridge Reservation, to arrest five persons charged with assault with a deadly weapon. While conducting a search incident to the arrest of several persons,[11] they recovered Special Agent Williams' .357 service revolver and several rifles linked ballistically to the case. Testimony revealed that the following items were found:

a. seven firearms, several of which had obliterated serial numbers (the serial numbers on Special Agent Williams' service revolver and on Ex. 29–A, the M–1 .30 caliber Gerand rifle which Butler carried on the day of the murders were obliterated);

b. a knapsack full of dynamite and hand grenades;

c. a suitcase full of blasting caps;

d. a bag containing spent rounds and live ammunition for various calibers;

e. walkie-talkie radios.

Peltier again alleges that the evidence of unrelated firearms and other weapons was unduly prejudicial because of its inherently inflammatory nature, arguing that its sole effect was to cause the jury to speculate about other bad acts of the defendant.

Again, no objection was made to the admissibility of any of this evidence. Much of it was clearly relevant and strongly probative. Special Agent Williams' revolver, six spent cartridges from Williams' revolver, six spent cartridges from Special Agent Coler's revolver, the M–1 rifle carried by Butler on the day of the murders, and the 44 Ruger carbine used by Joe Stuntz and carried out of Pine Ridge by Michael Anderson on the day of the murders were all seized at Rosebud.

The relevance of the remaining evidence is questionable. Assuming without deciding that it was erroneously admitted, we hold there was no plain error. No pictures or demonstrative evidence were admitted— only testimony, the purpose of which was to detail the discovery of the evidence directly related to the Pine Ridge episode. The parties agreed that Peltier was not present at Rosebud on the day the evidence was seized; the testimony revealed possession of weapons and explosive devices by *other persons*, and was not unfairly prejudicial to the defendant. *United States v. Graham, supra*, 548 F.2d at 1313.

### 3. Alberta, Canada

 On February 7, 1976, Peltier was arrested in Canada. The arresting officer testified that at the time of his arrest, Peltier had in his possession the .30/30 rifle stolen in Oregon, other property stolen from the Oregon ranch house, two pistols, and an M–1 semiautomatic rifle.

At the trial, Peltier made no objection to the admission of the two pistols or the .30/30 rifle found in his possession at the time of his arrest. Likewise, he did not object to the testimony regarding his possession of the property, including the .30/30 rifle stolen from the Oregon ranch house, or his possession of an M–1 semiautomatic rifle. We hold that the admission of this evidence was not plain error.

### 4. Not Prejudicial Error

Ordinarily the admission into evidence of weapons, or pictures of weapons, which are not directly related to the crime, and to which proper objection is made, is prejudicial to the defendant and in many cases it has been held to be reversible error. *See United States v. Robinson, supra*, 560 F.2d at 513–16; *United States v. Warledo, supra*, 557 F.2d at 725, and cases cited therein. In this case however almost all of the weapons, and some pictures which were not directly related to the crime, were admitted without objection. Some of these weapons and pictures of weapons were objected to by the defendant and as to these exhibits we hold the admission to be harmless error for these reasons: First, there were many weapons which were admitted without objection or were properly admitted as being found or

---

11. One of those present at the Rosebud Reservation was Darrell Butler.

used at the scene of the crime. The addition of the pictures and weapons which were not directly related to the crime and to which Peltier's counsel objected, could only be held to be cumulative and therefore not prejudicial.

Secondly, the direct and circumstantial evidence of Peltier's guilt was strong and, in our opinion, the admission of these additional exhibits did not prejudice the defendant's chances for acquittal.

## II

*F.B.I. Frame-up*

The defense theory at the trial was that shortly after the murders, agents of the F.B.I. focused upon Peltier as a principal suspect, and thereafter conspired to manufacture evidence against him, resorting to threats, intimidation, and subornation in an effort to secure his conviction. On appeal, Peltier contends that the district court ruled inadmissible the bulk of his proof of fabricated evidence and refused to charge the jury on the law applicable to the defense theory of the case, thereby depriving him, of his right to compulsory process and to a fair trial.

*A. Refusal to Give Defense Instruction*

■ The instruction which the court refused to give, Defendant's Proposed Jury Instruction No. 19, read as follows:

Testimony has been adduced in this case which if believed by you shows that the Government induced witnesses to testify falsely. If you believe that the Government, or any of its agents, induced any witness to testify falsely in this case [or in any related case], this is affirmative evidence of the weakness of the Government's case.

Defendant contends the court erred in refusing to give this instruction, citing certain evidence admitted at trial allegedly proving the frame-up and several cases which stand for the proposition that the defendant in a criminal case is entitled to have presented to the jury instructions encompassing any theory of defense which is supported by law

and which has some foundation in the evidence, however tenuous. *See United States v. Brown*, 540 F.2d 364, 380–81 (8th Cir. 1976); *United States v. Nance*, 502 F.2d 615, 619 (8th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975); *United States v. Vole*, 435 F.2d 774, 776–77 (7th Cir. 1970).

We reject defendant's contention that the trial court erred in refusing to give the proposed instruction. In the first place, proposed Instruction No. 19 does not incorporate what defendant contends was his theory of defense: that the government framed him by manufacturing evidence and inducing witnesses to testify falsely. The proposed instruction is essentially one relating to the credibility of witnesses, and was dealt with in the court's general instructions 30, 38, and 45 on impeachment and credibility. The principle espoused in *Brown* and *Nance* was meant to apply to a more comprehensive defense instruction or series of defense instructions. As the court stated in *Laughlin v. United States*, 154 U.S.App.D.C. 196, 207, 474 F.2d 444, 455 (1972), *cert. denied*, 412 U.S. 941, 93 S.Ct. 2784, 37 L.Ed.2d 402, *reh. denied*, 414 U.S. 882, 94 S.Ct. 169, 38 L.Ed.2d 130 (1973), in refusing to apply the principle to the proposed instruction that the jury must acquit the defendant if it believed defense testimony denying guilt:

What is required before the theory of the case rule comes into play is a more involved theory involving "law" or fact, or both, that is not so obvious to any jury. It is a matter of common sense that a government prosecution based on false testimony is a "weak" one.

In the second place, there is no evidentiary support for the instruction as written. Three critical government witnesses, Anderson, Draper, and Brown, who participated in the events of June 26 at Pine Ridge, did testify on cross-examination that F.B.I. agents threatened, intimidated, or physically abused them while questioning them in the initial stages of the investigation about their knowledge of the murders. Brown, in his testimony as a witness for the

defense, also stated that he testified falsely before the grand jury as a result of fear of the F.B.I. All three witnesses testified than when they were *interviewed*, at early stages of the investigation, their answers to the F.B.I.'s questions were inconsistent with the truth for one reason or another. However, upon further questioning at the trial by the government attorney, they stated that the testimony they gave at the trial was the truth, as they best remembered it. Thus, their testimony provided no support for the proposed defense instruction that the government induced them to *testify* falsely in this trial or in a related trial.[12]

Since the proposed instruction was essentially a credibility instruction already covered by the instructions given to the jury, and since there was no evidence that the government induced the witnesses to testify falsely at the trial, we perceive no error in the court's failure to give the proposed instruction. *United States v. Rabbit*, 583 F.2d 1014 at 1024 (8th Cir. Sept. 5, 1978); *United States v. Fuel*, 583 F.2d 978 at 989–990 (8th Cir. Aug. 16, 1978).

*Failure to Give a More Comprehensive Theory of the Defense Instruction*

 The next issue is whether the trial court should have given a more comprehensive theory of the defense instruction. Peltier relies heavily on *United States v. Vole, supra*, 435 F.2d at 776, where the court found the failure to give the following instruction reversible error:

> You are instructed that it is the defendant Vole's theory of this case that Charles Masini conspired with other persons to frame him for a counterfeiting conspiracy. If the facts adduced in support of the defendant Vole's theory create in your mind a reasonable doubt of his guilt of these charges, then you must find the defendant Vole not guilty of these charges.

Peltier, while attempting to prove his theory that he was the victim of an F.B.I. frame-up, did not request a similar instruction. We find the court's failure to give such an instruction was not plain error. *Cf. United States v. Hamilton*, 420 F.2d 1096, 1098–99 (7th Cir. 1970). We have concluded that the jury could not have been misled by the failure to receive a theory of defense instruction. The court's instructions clearly stated the government's burden of proof, the matter of credibility of witnesses was covered in great detail, and defense counsel vigorously asserted the theory of defense throughout the trial and in closing argument in an effort to discredit the government's case.

We note, furthermore, that Peltier's contentions of manufactured evidence are far from convincing. The district court allowed Peltier to present the following evidence relating to his theory of defense:

*1. Discovery of the .223 caliber casing.* The .223 caliber cartridge casing allegedly found in the trunk of Coler's car was critical evidence against Peltier. In an affidavit used in the Canadian extradition proceedings, F.B.I. Agent Cunningham stated that he had found the .223 cartridge casing in Coler's trunk. However, a 302 report [13] prepared by Cunningham on June 29, 1975, failed to document discovery of the casing. Cunningham later recanted that portion of his affidavit relating to his discovery of the cartridge.

Other evidence presented at the trial strongly contradicts Peltier's claim that the cartridge was not found in Coler's trunk. Winthrop Lodge, an F.B.I. fingerprint expert, testified that he found the .223 cartridge casing in the trunk of Coler's car on June 29, 1975, when he was examining the car for fingerprints. He produced his handwritten field notes, which documented his discovery. He further testified that the car had been searched and had been towed to a garage in Hot Springs, South Dakota. He

---

12. Brown also stated that he lied to the grand jury. However, he affirmed, after his testimony regarding lying to the grand jury, that his testimony at trial was the truth.

13. A 302 report is an F.B.I. form on which are transcribed notes or recollections of F.B.I. agents made in the course of their investigations.

turned the casing over to Cortlandt Cunningham, who began his examination of Coler's vehicle immediately after Lodge finished. The fact that Cunningham signed an affidavit that he had found the cartridge casing was merely a technical error.

2. *Sighting of Peltier and Eagle.* Special Agent Coward testified that late in the afternoon on the day of the murders,[14] he saw through the telescopic sight on his rifle two individuals, one of whom he identified as the defendant, at the scene of the crime. Coward also interviewed BIA Officer Stoldt, who was with him when he sighted the defendant. In his 302 report, which showed the date of the interview as June 28, 1975, Coward stated that Stoldt told of sighting two persons, one of whom looked like Jimmy Eagle, through his binoculars. Coward interviewed Stoldt again on September 4, 1975, and reported that Stoldt was now positive that he had seen Eagle and had also seen Peltier on June 26. Stoldt was called as a defense witness, denied that he talked to Coward on June 28, and stated that he was uncertain on June 26 that one of the persons he sighted was Eagle.

Peltier contends that the discrepancy between Coward's and Stoldt's accounts was proof that Coward participated in the frame-up by falsely recording evidence. Again, however, the government offered an explanation for the apparent discrepancy. Stoldt testified that he talked to Coward only on June 26 and September 4, 1975, and not on June 28. Coward's testimony at trial was consistent with Stoldt's; he stated that he interviewed Stoldt and dictated his 302 report on June 26, and that the secretary simply made a typing error in dating the report June 28. Both witnesses at trial reaffirmed their sightings of Eagle and Peltier on June 26. In his second 302 of November 4, Coward wrote: " 'Stoldt stated that during the first statement he had given to the F.B.I. *a few days after the shooting* of the agents, he told the agents then * * * that he saw Jimmy Eagle in the group that he had just identified.' " (Em-

phasis added.) Coward explained that when he wrote the second 302, he dated Stoldt's statement by referring back to the first 302 which showed his first interview as being on June 28. He also stated that on further reflection, he remembered that his first interview with Stoldt was on June 26.

3. *Association of .223 Cartridge Casing with AR–15.* An October 1975, F.B.I. lab report contained a finding that the .223 cartridge casing recovered from the trunk of Coler's car could not be associated with any of the weapons which had been submitted to it for analysis. However, a February 1976, F.B.I. report contained a finding that the .223 casing could be associated with the Wichita AR–15.

Peltier describes as "mysterious" the association of the .223 casing with the Wichita AR–15 four months after a report which concluded that no association could be found. However, the firearms expert, Evan Hodge, testified that he first began to examine Ex. 34–B, the .223 cartridge casing, in December of 1975 or January of 1976. Defense counsel did not cross-examine him on the truth of this statement.

Because the instructions to the jury clearly set out the government's burden of proof, because the defense counsel stressed the theory of defense throughout the trial and in closing argument, and because of the nature of the defendant's proof of the alleged frame-up, we find no plain error in the court's failure to give a theory of the defense instruction.

**B. *Denial of Right to Compulsory Process***

The trial court excluded certain evidence which Peltier contends was vital to his defense, stating that:

[T]he Court's position with reference to evidence to be offered by the defense is simply that evidence relative to the issues and the evidence presented by the government will be admitted. I will state, however, that witnesses who have testified will not be impeached by a showing of misconduct of the Federal Bureau

14. The agents were murdered at approximately 12:00 noon.

of Investigation *unless that misconduct relates to the testimony of the individual witnesses who have testified or unless that misconduct relates to exhibits that have been received in evidence.* (Emphasis added.)

The most significant evidence excluded was the testimony of Myrtle Poor Bear and Jimmy Eagle.

*1. Jimmy Eagle Episode.* Jimmy Eagle testified in an offer of proof that he was not on the Pine Ridge Reservation on June 26, 1975. He was later arrested on another charge, and F.B.I. agents who questioned him threatened to have him indicted for the murders if he did not cooperate in the investigation. He did not cooperate and was later indicted. As a result of the F.B.I. threats, his attorney warned him to remain silent at all times because the government would probably place informers in his cell.

After Eagle had been incarcerated for a time, the government obtained statements of four of his cellmates recounting Eagle's description to them of the events of June 26. Eagle testified in the offer of proof that he never made any of the statements attributed to him. Peltier contends the statements of the four cellmates were so thorough, and conformed so completely to the F.B.I.'s theory of the murders, that they impel the inference the F.B.I. concocted the statements and solicited the cooperation of four felons who desired favorable treatment.

*2. Myrtle Poor Bear Episode.* In February and March, 1976, Myrtle Poor Bear signed three affidavits which related her eyewitness account of the murders of the two agents on June 26, 1975. Two of these affidavits were considered by Canadian officials in the extradition proceedings. In testimony given outside of the presence of the jury at the trial, Poor Bear disclaimed virtually every allegation contained in the affidavits. She testified that she had been forced to sign the affidavits, which were prepared by the F.B.I., under threats of physical harm.

The court excluded the proffered testimony under Rule 403 of the Federal Rules of Evidence. It found that the evidence was not material, and that any relevance it might have was outweighed by the danger of confusion of the issues and misleading the jury.

Peltier contends that the trial court, in excluding the Jimmy Eagle and Myrtle Poor Bear testimony, denied him his right to compulsory process. We disagree.

In *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Supreme Court held that the sixth amendment right to compulsory process includes, in appropriate circumstances, the right to introduce relevant and material testimony from a witness qualified to testify under an appropriate standard of credibility. The Court reaffirmed the importance of allowing the defendant to present his defense in *United States v. Nixon,* 418 U.S. 683, 711, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), stating that:

> The right to the production of all evidence at a criminal trial similarly has constitutional dimensions. The Sixth Amendment explicitly confers upon every defendant in a criminal trial the right "to be confronted with the witnesses against him" and "to have compulsory process for obtaining witnesses in his favor." Moreover, the Fifth Amendment also guarantees that no person shall be deprived of liberty without due process of law. It is the manifest duty of the courts to vindicate those guarantees, and to accomplish that it is essential that all relevant and admissible evidence be produced.

However, the right of a defendant to introduce the testimony of witnesses in his behalf is not absolute. As the Supreme Court noted in *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973):

> Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E. g., Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). In the exercise of this

right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.

An analogous case is *United States v. Nobles,* 422 U.S. 225, 241, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), in which Justice Powell made this observation: "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth."

■ Under the Federal Rules of Evidence, the trial court has broad discretion in determining the relevancy and admissibility of evidence. *United States v. Briscoe,* 574 F.2d 406, 408 (8th Cir. 1978); *United States v. Bad Cob,* 560 F.2d 877, 880 (8th Cir. 1977). It is only where the trial court excludes relevant evidence without sufficient justification that the defendant's constitutional right to compulsory process is violated. *See United States v. Melchor Moreno,* 536 F.2d 1042, 1045–46 (5th Cir. 1976). The evidence proffered by Peltier was justifiably excluded in this instance under the provisions of Fed.R.Evid. 403.

The evidence was only minimally relevant. Neither Jimmy Eagle nor Myrtle Poor Bear testified as a government witness against Peltier. Furthermore, Peltier made no showing that the integrity of the government's evidence against him was in any way tainted by the Myrtle Poor Bear and Jimmy Eagle episodes.

Peltier argues that the evidence was relevant to show bias on the part of government witnesses Anderson, Draper, and Brown. He argues that Poor Bear's and Eagle's testimony, if believed by the jury, might have caused the jury to speculate further as to whether the knowledge Anderson, Draper, and Brown testified to was implanted in their minds by coercive F.B.I. interrogation.

■ It is true that "[e]vidence tending to show a substantial reason for bias or interest in an important witness is never

collateral or irrelevant. It may be * * * the very key to an intelligent appraisal of the testimony of the [witnesses]." *Barnard v. United States,* 342 F.2d 309, 317 (9th Cir. 1965). *See Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Johnson v. Brewer,* 521 F.2d 556, 561 (8th Cir. 1975). However, Eagle's and Poor. Bear's allegations of F.B.I. harassment, even if true, shed very little, if any, light on the credibility of *other* witnesses, since the trial court allowed full inquiry into the dealings of Anderson, Draper, and Brown with the F.B.I. In light of the full presentation to the jury of F.B.I. actions which might have caused bias on the part of these three witnesses, the testimony of Poor Bear and Eagle would only have been cumulative.

■ Peltier also argues that the Poor Bear and Eagle testimony was admissible to show the intention of the F.B.I. to bring about his conviction, no matter what the cost. This issue is a more difficult one. As we stated earlier, Peltier's theory of the case was that the F.B.I. framed him by manufacturing evidence and inducing witnesses to testify in accordance with its theory of the murders. The Poor Bear and Eagle testimony was certainly consistent with that theory. However, we do not find an abuse of discretion on the part of the district court in excluding the evidence. The district court weighed the following factors:

a. the defendant's failure to point to specific evidence used against him, the reliability of which was directly affected by the Poor Bear or Eagle episodes;

b. the lack of probative value of the proffered evidence.

i. *Myrtle Poor Bear.* It is apparent, from reading the trial transcript, that Myrtle Poor Bear was not a reliable witness. Her testimony was at all times very vague, and she often responded that she could not remember. Indeed, defense counsel, anticipating that she would be called as a witness for the government, described her in his opening statement as a "witness whose

mental imbalance is so gross as to render her testimony unbelievable."

ii. *Jimmy Eagle.* In addition to offering Eagle's testimony, the defense also called two of the four cellmates who gave the allegedly fabricated statements to the government. Both witnesses affirmed the truth of their earlier statements to the F.B.I., and denied that the F.B.I. induced them to make false statements.[15] There was thus no real proof that the F.B.I. solicited statements from the four cellmates. There was only proof that Eagle denied making the statements.

c. The probability that the government would offer countervailing evidence, thus extending an already lengthy trial.

d. The danger of unfair prejudice to the government. The proffered evidence would clearly have tended to divert the jury's attention from the issue before it—Peltier's guilt or innocence.

While the more prudent course might have been to allow the defense to present the evidence, we find no abuse of discretion in the trial court's exclusion of the testimony of Jimmy Eagle and Myrtle Poor Bear, in light of its low probative value, the potential for further delay in the trial, and the danger of unfair prejudice to the government.

We now summarize briefly the remaining evidence excluded by the trial court which the defendant contends further supported his defense that he was the victim of an F.B.I. frame-up. We have concluded that the evidence would not have bolstered the defense theory and was properly excluded.

■■■■■■■ *Telescopic Sight Demonstration.* Coward and Stoldt testified that when they sighted Peltier and Eagle on the day of the murders, they were approximately one-half mile from them. The defendant requested that the members of the jury be permitted to look through Coward's telescopic sight to satisfy themselves that an identification

could not be made from such a distance. The question of whether to permit jury experiments rests within the discretion of the trial court. *Friedman v. United States,* 347 F.2d 697, 709 (8th Cir.), *cert. denied,* 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354 (1965). We hold that the trial court's refusal to allow the jury members to look through the telescopic sight was not an abuse of discretion here. The trial court did permit the defendant to introduce the testimony of a firearms expert, who attempted to identify a familiar individual through the same telescopic sight at a distance of one-half mile and was unable to do so. The expert did *not* testify that such an identification was impossible. Furthermore, on cross-examination, the expert testified that a number of factors could influence a person's ability to make such a sighting, including atmospheric conditions, the eyesight of the observer, the lay of the land, and prior training with a scope. Since these variables would affect each juror's experience with sighting through Coward's sight, we agree with the district court that such an experiment would have little, if any, probative value.

■■■■■ *F.B.I. Lab Reports.* While the district court admitted into evidence the lab reports regarding the association or lack of association between the .223 casing and the Wichita AR–15, the court refused to allow defense counsel to mention the dates of the reports in his argument to the jury, citing Fed.R.Evid. 613(b). Defense counsel stated his firm agreement with the court's ruling. The court's reason for restricting counsel was that when the author of the reports, Evan Hodge, was on the stand, counsel for the defense declined to question him as to the reason for the apparent inconsistency, after the trial court suggested that he do so. We hold that the district court did not abuse its discretion in so limiting defense counsel's argument. On redirect, in response to a question from government

---

**15.** The two witnesses testified outside the presence of the jury that after their testimony at trial, they had been threatened by Peltier himself that if they did not return to court and testify that their earlier testimony had been induced by F.B.I. threats, their lives would be in danger.

counsel, Hodge stated that he first began to examine Ex. 34–B, the .223 cartridge casing, in December of 1975 or January of 1976. On recross, defense counsel did not question Hodge on the timing of his association of the Wichita AR–15 with the .223 casing, preferring to let the lab reports speak for themselves. The lab reports were before the jury, which could draw what inferences it chose.

*Waring 302.* Special Agent Waring's 302 was an eight-page report which apparently had been typed on two typewriters. The dates of dictation (June 26) and transcription (June 30) were transposed. The defendant contended that the report had been doctored at a later time to conform with the emerging theory of the case. The district court refused to admit the report, but allowed extensive testimony concerning the alleged difference in type.

Special Agent Waring testified that he had dictated one of his 302s to two different secretaries, who may have typed the 302 on two different typewriters. Defense counsel, on cross-examination, questioned Waring about the fact that the 302 was typed on two different typewriters and suggested that Waring had had the 302 retyped so as to conform to an agreed upon version of the facts. Waring denied the allegation. Defense counsel then sought to introduce the 302 into evidence to allow the jury to witness the different types on the report. The defense later called a witness who testified that the 302 in question did indeed contain two different types. Even were we to hold that the trial court erred in excluding the report, we fail to see how the defendant was prejudiced by the trial court's ruling, in view of the fact that the question of the different types was examined in such detail in the testimony.

16. Peltier also contends that the trial court failed to exercise any discretion at all, declaring "its rigid policy of traditionally denying jury requests for testimony." We have reviewed the transcript and are not persuaded that the trial court's comments may properly be construed as stating such a policy. We note, however, the holding of the United States Court of Appeals for the Seventh Circuit, that:

## III

### *Refusal to Read Testimony to Jury*

During its deliberation the jury made two requests that certain trial testimony be read: a portion of Michael Anderson's testimony, and the two statements made by Peltier after his comment at his arrest that, if he had known the persons approaching him were law enforcement officers, "he would blow [them] out of [their] shoes." The trial court refused the requests, instructing the jury instead to rely upon its recollection of the witnesses' testimony during trial.

The decision to read testimony as requested by the jury rests within the sound discretion of the trial judge. *United States v. Ballard,* 535 F.2d 400, 407 (8th Cir.), *cert. denied,* 429 U.S. 918, 97 S.Ct. 310, 50 L.Ed.2d 283 (1976); *United States v. Mesteth,* 528 F.2d 333, 334 (8th Cir. 1976). We have examined the requested testimony and are satisfied that the trial court did not abuse its discretion.[16] The testimony was not crucial to the verdict, as the defendant contends, citing *United States v. Rabb,* 453 F.2d 1012, 1013–14 (3d Cir. 1971). Furthermore, the failure to read the testimony did not create unfairness to him, as he contends, citing *United States v. Jackson,* 257 F.2d 41 (3d Cir. 1958), since the requested testimony was favorable to the government's case.

## IV

### *Extradition*

Peltier contends, for the first time on appeal, that the trial court had no jurisdiction to try him, because he was extradited from Canada in violation of the Webster-Ashburton Treaty, 8 Stat. 572.

[W]e believe a judge could properly adopt and follow a routine practice of declining such requests unless supported by some extraordinary showing of need.
*United States v. McCoy,* 517 F.2d 41, 45 (7th Cir.), *cert. denied,* 423 U.S. 895, 96 S.Ct. 195, 46 L.Ed.2d 127 (1975).

Article X of the Webster-Ashburton Treaty provides in pertinent part that:

It is agreed that the United States and Her Britannic Majesty shall · * * * deliver up to justice all persons who, being charged with the crime of murder * * * shall seek an asylum, or shall be found, within the territories of the other: *provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial* * * *. (Emphasis added.)

8 Stat. 576. Peltier contends that the evidence of criminality presented to the Canadian tribunal "consisted of the false affidavits of Myrtle Poor Bear, obtained by the government through coercion and deceit and known by the government to be false." He contends that the presentation of false evidence violated the terms of the treaty, thereby depriving the trial court of jurisdiction. He cites a long line of cases beginning with *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), which stand for the proposition that the demanding state may not charge and try the extradited defendant for a crime other than one enumerated in the applicable extradition treaty, and for which he was specifically extradited.

The government argues that the jurisdiction of the trial court over the defendant is not affected by the manner in which his presence before the court was obtained, citing *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952) and *Ker v. Illinois,* 119 U.S. 436, 444, 7 S.Ct. 225, 30 L.Ed. 421 (1886). We do not find it necessary to decide what standard should be applied to the review of claims of government misconduct in international extradition proceedings,[17] since, under any standard, Peltier's claim is, on its face, lacking in substance. Peltier does *not* claim that he was extradited solely on the basis of Myrtle Poor Bear's affidavits[18] or that the other evidence presented to the Canadian tribunal was insufficient to warrant extradition. It is clear from a review of the trial transcript that other substantial evidence of Peltier's involvement in the murders was presented in the extradition proceedings, but the record of those proceedings was not made available either to the trial court or to this court.

## V

### *Collateral Estoppel*

■■■ Peltier alleges that his prosecution was barred by the doctrine of collateral estoppel, since codefendants Robideau and Butler were found not guilty by a jury on the basis of evidence much of which was the same evidence adduced against Peltier. Peltier was not a party to that proceeding, and may not invoke the doctrine of collateral estoppel. *United States v. Brown,* 547 F.2d 438, 444 (8th Cir.), *cert. denied,* 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977). *Cf. Turley v. Wyrick,* 554 F.2d 840, 842 (8th Cir. 1977), *cert. denied,* 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978).

The judgment of conviction is affirmed.

---

**17.** We note that the United States Court of Appeals for the Second Circuit has recently declined to give such broad effect to *Frisbie* and *Ker,* holding in *United States v. Toscanino,* 500 F.2d 267, 275 (2d Cir. 1974) that:

[W]e view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights.

**18.** The use of the affidavits of Myrtle Poor Bear in the extradition proceedings was, to say the least, a clear abuse of the investigative process by the F.B.I. This was conceded by government counsel on the hearing in this court. . It does not, however, follow that the testimony of this obviously confused and "unbelievable" witness should have been permitted under either theory advanced by Peltier as hereinbefore set forth. See discussion, *supra,* at p. 332 of this opinion.