**UNITED STATES of America, Appellee,**

v.

**James D. ELLISON, Appellant.**
**(Two Cases)**

Nos. 85–2094, 85–2095.

United States Court of Appeals,
Eighth Circuit.

Submitted March 10, 1986.

Decided June 17, 1986.

Neal Kirkpatrick, Ft. Smith, Ark., and James Haaser, Barling, Ark., for appellant.

Sidney M. Glaser, Washington, D.C., for appellee.

Before McMILLIAN and BOWMAN, Circuit Judges, and HANSON,* Senior District Judge.

BOWMAN, Circuit Judge.

James D. Ellison appeals his conviction of violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), by participating in the affairs of an enterprise through a pattern of racketeering activity, and of violating 18 U.S.C. § 1952(a)(3) through interstate travel to promote arson. Ellison also entered a conditional plea of guilty to charges of conspiracy to possess unregistered automatic weapons, destructive devices, and silencers in violation of 26 U.S.C. § 5861 and 18 U.S.C. § 371, and of possessing unregistered firearms in violation of 26 U.S.C. §§ 5861(d) & 5871. The guilty plea is conditional in that Ellison specifically preserved his right to review on appeal the District Court's [1] denial of his motion to suppress evidence. We affirm.

## I.

Ellison is the founder and leader of a group dedicated to securing the supremacy of white Christians by promoting and engaging in defensive activities such as survivalism and paramilitary training, and in offensive activities intended to cause the downfall of the United States government. The group, variously known as the Christian Brothers Cedar, the Zarapeth-Horeb Church, and the Covenant, the Sword, and the Arm of the Lord (CSA), occupied a 224-acre farm or compound in north central Arkansas, abutting the Missouri state line. Ellison established the refuge in the mid-1970's as a religious retreat. In 1978, Ellison and the governing council of elders reoriented the group's activities to prepare for an envisioned downfall of the government and an accompanying civil war.

CSA came to the attention of agents of the Federal Bureau of Investigation and of the Bureau of Alcohol, Tobacco, and Firearms circa 1980. The agents began investigating CSA in 1983 and intensified their investigation in 1984, interviewing former CSA members who had lived on the compound. Through these informants, the agents learned that CSA was stockpiling military-type guns, fabricating silencers and grenades, converting semi-automatic weapons to automatic weapons, engaging in paramilitary training, and burying land mines around the compound perimeter. The agents also learned that CSA was involved in such activities as arson (burning Ellison's sister's house so she could collect the insurance proceeds, partially burning a Springfield, Missouri church, the congregation of which allegedly consisted of homosexuals, and partially burning a Jewish community center in Indiana), attempting to blow-up a natural gas pipeline, and theft. These activities were intended to produce operating funds, to plunder the property of certain "unacceptable" groups, and to hasten the collapse of the government.

The investigation of CSA culminated in April 1985 in an application for a warrant to search the compound for illegal firearms, explosives, stolen jewelry and stolen automobiles, equipment to make silencers

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The Honorable Oren Harris, Senior United States District Judge for the Western District of Arkansas.

and to convert semi-automatic weapons to automatic status, and records relating to the purchase or sale of firearms and to the identity of fugitives living in the compound. The magistrate issued the warrant and several days later 250 to 300 law enforcement agents arrived at the compound to execute both the search warrant and a warrant to arrest Ellison for firearms violations. The inhabitants initially resisted entry, but after three days Ellison and two federal fugitives agreed to surrender. The agents then spent several days searching the compound. Two days later, a federal grand jury indicted Ellison for racketeering activities and interstate travel to promote arson, and shortly thereafter the grand jury indicted him on the firearms-related charges. As mentioned above, he pled guilty to the charges in the second indictment. Trial by jury resulted in his conviction on the charges in the first indictment.

Appealing his conviction and the District Court's denial of his motions to suppress evidence, which contributed to his pleading guilty to the charges in the second indictment, Ellison raises three issues. First, he argues that the District Court erred by denying his motions to suppress evidence seized during the search of the CSA compound. Second, he asserts that the District Court erred by not requiring the government to accept his stipulation that CSA constituted an enterprise for RICO purposes. Third, he contends that the District Court erred in denying his motion for acquittal or for a new trial.

## II.

Ellison first argues that the search of the CSA compound was unlawful and therefore that the District Court should have suppressed the evidence seized during that search. In particular, Ellison contends that probable cause to issue the warrant did not exist because the affiant did not provide the magistrate indicia of the seven informants' reliability or credibility. In addition, he asserts that the information in the affidavit was so old as to be stale and unreliable. Ellison alternatively asserts

that even if probable cause did exist, the warrant was fatally defective because it authorized a general search by failing to describe locations or particular items of contraband with particularity. We find these contentions meritless.

Under *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), we are to take a totality-of-the-circumstances approach to the question of whether probable cause existed to believe that incriminating evidence was located in a particular place at the time a warrant was issued. Considerable deference is owed to a magistrate's determination of probable cause. *Id.* at 236, 103 S.Ct. at 2331. Our duty is "simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* at 238–39, 103 S.Ct. at 2332 (citation omitted); *United States v. Arenal*, 768 F.2d 263, 266 (8th Cir.1985).

Ellison's argument concerning the affidavit's lack of information regarding the informants' reliability and credibility fails both legally and factually. As we said in *United States v. Ross*, 713 F.2d 389, 393 (8th Cir.1983), an informant's "veracity," "reliability," and "basis of knowledge" are important, but "should be understood as 'relevant considerations in the totality of the circumstances analysis,' not as separate requirements for a finding of probable cause." In the present case, although the affiant did not say that the informants were reliable and credible, the affidavit stated that they all had first-hand knowledge of the matters and objects described in the affidavit by their having lived, often for many years, in the compound. Further, by reading the statements in the affidavit, the magistrate could confirm the reliability of the informants' information in part by noting the consistency of their statements, particularly since they were interviewed separately on different dates and by inference at different places. In addition, the affidavit indicated that surveillance by law enforcement officers had confirmed some of the informants' information concerning

the layout of buildings within the compound.

■■■■ At the suppression hearings, the affiant acknowledged that he had not told the magistrate that several of the seven informants were in jail or that several had received financial consideration from the government. The general rule is that an affidavit need only show facts adequate to support a finding of probable cause. The omission of facts rises to the level of misrepresentation only if the omitted facts "cast doubt on the existence of probable cause." *United States v. Dennis,* 625 F.2d 782, 791 (8th Cir.1980). Although as a matter of good practice the affiant should have informed the magistrate of the incarceration of and payments for the benefit of some of the informants, we do not believe that in this case the omission of these facts undermined the informants' information or cast doubt on the existence of probable cause under the standard of *Illinois v. Gates.*

■■■■ Ellison's argument that probable cause could not have existed because the informants' information was so old as to be stale also fails. Delay in seeking a search warrant may invalidate the warrant because probable cause must exist at the time the warrant is issued, not at an earlier time. *United States v. Steeves,* 525 F.2d 33, 37–38 (8th Cir.1975). The lapse of time, however, is not necessarily the controlling consideration. Other factors include the nature of the criminal activity and the type of property sought, *id.* at 38, considered in the light of common sense. *Dennis,* 625 F.2d at 792. Applying these factors, we note that one of the informants had been in the compound and had seen military-type weapons there as recently as one month before the agents sought the search warrant. The other informants had lived in the compound at various times extending back as far as 1976, although all the informants had lived in the compound in the early to mid-1980's. In addition, the criminal activity—illegal possession of firearms, explosives, and grenades, as well as illegal actions like arson and theft—was continu-

ous since 1978. Considering CSA's paramilitary orientation and its desire to foster the collapse of the government, it could be presumed that CSA would retain firearms, explosives, and related items over a long period of time. In April 1985 there was every reason for the federal agents to believe that CSA had not, in the brief space of one month since an informant most recently had been inside the compound, renounced its violent purposes or the weaponry necessary to accomplish those purposes.

■■■■ Ellison also contends that the search warrant was deficient because it failed to describe particularly the place to be searched and the items to be seized. He first argues that the search warrant description of the CSA property was inadequate because it did not match exactly the legal description on the deed to the property. This argument is absurd. Although the Fourth Amendment does require that search warrants particularly describe the place to be searched, *Milliman v. Minnesota,* 774 F.2d 247, 249 (8th Cir.1985), and *United States v. Clark,* 531 F.2d 928, 931 (8th Cir.1976), it does not require legal descriptions such as those necessary for property transactions. Warrants are sufficient when they "provide reasonable guidance to the exercise of informed discretion of the officer executing the warrant." *United States v. Faul,* 748 F.2d 1204, 1219 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 3500, 87 L.Ed.2d 632 (1985). The test for determining the adequacy of the description of the place to be searched is whether it enables "the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched." *United States v. Gitcho,* 601 F.2d 369, 371 (8th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979). Here, the warrant contained both a very detailed description of the CSA acreage taken from prior mortgage foreclosure proceedings concerning the same property and instructions on how to reach the property by car, delineating both roads and mileage. This informa-

tion enabled the executing officers to locate and identify the compound easily, and there was no reasonable probability that any other premise might be searched mistakenly. We thus conclude that the warrant adequately described the place to be searched.

As to the items to be seized,[2] the specificity required is flexible and will vary with the circumstances and the type of items involved. *Marvin v. United States*, 732 F.2d 669, 673 (8th Cir.1984); *United States v. DeLuna*, 763 F.2d 897, 908 (8th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). In addition, under the plain view doctrine announced in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality), law enforcement officers can exceed the original scope of the warrant where they are engaged in an otherwise lawful search and inadvertently discover contraband or other items the incriminating nature of which is immediately apparent. *United States v. Johnson*, 541 F.2d 1311, 1316 (8th Cir.1976); *see Texas v. Brown*, 460 U.S. 730, 739, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983) (plurality). As the Supreme Court said in *Brown,*

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief" ... that certain items may be contraband or stolen property or *useful as evidence of a crime....* A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.

*Id.* at 742, 103 S.Ct. at 1543 (citations omitted, emphasis added).

Ellison complains that the agents executing the search warrant seized items not described in the warrant and that several of the items—a silhouette target depicting

a law enforcement officer, and CSA literature, insignia, and records—were introduced at trial. While these items are not contraband, they are evidence pertaining to crimes (particularly illegal possession of firearms and the existence of an enterprise under 18 U.S.C. § 1962), as described in *Brown.* The officers could not have anticipated finding exactly these items, and their discovery was inadvertent. Moreover, considering what the officers already knew about CSA's purposes and its violent methods (the investigating officers had thoroughly briefed the officers executing the search warrant on CSA), the potential usefulness of these items as evidence of criminal conduct was readily apparent. Moreover, little was made of any of these items at trial. Assuming *arguendo* that they should have been suppressed, their admission was harmless error beyond any doubt. *See Chambers v. Maroney*, 399 U.S. 42, 53, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970) (holding that if there was error in admitting ammunition seized in a search it was harmless beyond a reasonable doubt).

We conclude that the magistrate had a substantial basis for determining that probable cause existed for the issuance of the warrant authorizing the search of the CSA compound. In addition, we conclude that the warrant's descriptions of the location to be searched and the items to be seized were sufficiently particular to comply with the Fourth Amendment. We also conclude that the seizure of items not specified in the warrant fell within the plain view exception to the warrant requirement. Accordingly, we hold that the District Court did not err in denying Ellison's motions to suppress evidence.

### III.

Ellison next argues that the District Court erred by not requiring the

---

2. The search warrant described the items to be seized as

> illegal firearms, explosives along with stolen jewelry and automobiles. Also, equipment used to make silencers and the conversion of weapons from semi-automatic to automatic status, records relating to the purchase and

sale of firearms or the identity of fugitives on the property, and a weapon, that is, a knife, that may have been used in the murder of an individual in Oklahoma as more specifically set out in the attached affidavit.

Designated Record at 13.

government to accept his stipulation that CSA constituted an enterprise for RICO purposes. In a related argument, Ellison asserts that the District Court erred by denying his motion *in limine* to prohibit the government from proving that CSA was an enterprise by introducing evidence not connected with the charges in the indictment.

Under RICO, the government has the burden of establishing, as a separate element of the crime, that CSA was an enterprise. *See* 18 U.S.C. § 1962; *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). Generally, the government is not bound by a defendant's offer to stipulate to an element of a crime. *United States v. Peltier,* 585 F.2d 314, 324 (8th Cir.1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *United States v. Flenoid,* 718 F.2d 867, 868 (8th Cir.1983). The rationale for the rule is to enable the government to present to the jury a complete picture of the events constituting the crime charged. " 'To substitute for such a picture a naked admission might ... rob the evidence of much of its fair and legitimate weight.' " *Peltier,* 585 F.2d at 324 (citation omitted). Nevertheless, the general rule is subject to Federal Rule of Evidence 403 concerning the exclusion of relevant evidence on the ground of prejudice. "The government is not bound to stipulate to such facts unless the prejudicial aspects of the testimony in context outweigh its probative value...." *United States v. De-John,* 638 F.2d 1048, 1053 (7th Cir.1981).

The evidence of other criminal activities not charged in the indictment, introduced at trial over Ellison's objection, consisted of testimony that CSA members attempted to blow up a natural gas pipeline, attempted to burn a Jewish community center in Indiana, and stole jewelry from a pawn shop, as well as other evidence concerning the use and accumulation of firearms and explosives on CSA property. We review the District Court's decisions in such matters under the abuse of discretion standard. *Peltier,* 585 F.2d at 325. Here, we cannot say that the prejudicial aspects of the disputed evidence outweigh its probative value, and thus we hold that the District Court did not abuse its discretion in refusing to exclude the government's evidence establishing that CSA was an enterprise for RICO purposes.

## IV.

Ellison finally asserts that the government failed to meet its burden of proving that there was any connection between one of the two arsons charged in the RICO count and any interest of CSA as an enterprise. He also contends that the government failed to show that his travel in interstate commerce to Springfield, Missouri, where CSA attempted to burn down a church, was for the purpose of carrying out illegal activities. Therefore, he concludes that the District Court erred in denying his motions for acquittal and for a new trial. After reviewing the trial record, we find the evidence sufficient to support his conviction and we affirm the District Court's denial of his motions.

We must sustain the jury's verdict finding Ellison guilty as charged if there is substantial evidence, viewed in the light most favorable to the government, to support it. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Garcia,* 785 F.2d 214, 225 (8th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986). We resolve all factual disputes in favor of the jury verdict and accord the government the benefit of all inferences that reasonably may be drawn from the evidence. *Id.; see Lemm,* 680 F.2d at 1199.

 A violation of RICO [3] requires proof of the conduct of an enterprise af-

---

**3.** 18 U.S.C. § 1962(c) reads in part: "It shall be unlawful for any person employed by or associ-ated with any enterprise engaged in, or the activities of which affect, interstate or foreign

fecting interstate commerce through a pattern of racketeering activity involving two or more predicate acts. *See Sedima, S.P. R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The government also must prove that the predicate acts charged—in the present case the two arsons—were related to the affairs of the enterprise, and that such activities were of an ongoing or continuous nature. *Sedima,* 105 S.Ct. at 3285 n. 14. Conduct " 'forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* (quoting 18 U.S.C. § 3575(e) ). The government had the burden of proving (1) that Ellison committed the predicate acts as alleged; (2) that his position in the enterprise facilitated his commission of the racketeering acts, and (3) that the predicate acts had some effect on the enterprise. *United States v. Cauble,* 706 F.2d 1322, 1332–33 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). The government did not have to prove that Ellison's racketeering activity benefitted the enterprise, but only that the predicate acts *affected* the enterprise. *Id.* at 1333 n. 24. We are mindful that the evidence used to prove the existence of the enterprise and the pattern of racketeering activity may in some cases coalesce. *Lemm,* 680 F.2d at 1199 (quoting *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528).

 The evidence clearly shows that Ellison directly participated with other CSA members in the burning of his sister's home and in the burning of the church in Springfield, Missouri. His position as leader of CSA enabled him to assign members to specific jobs and tasks and to direct their activities, both legitimate and illegitimate.

Although the two arsons that the government relied upon to establish a pattern of racketeering activity had no direct financial benefit to CSA or Ellison, the evidence showed that these predicate acts did bolster CSA members' morale and commitment to CSA, and in the instance of the burning of the church in Springfield, furthered CSA's intentions to punish nonconforming groups. The arson of Ellison's sister's house enabled her, a former member, to gain financially and demonstrated CSA's contempt for the property rights of others. For CSA members, such activities could have reinforced their hostile attitudes toward the larger society outside their compound. As the government showed, the two arsons were part of a series of arsons, thefts, and other crimes forcefully demonstrating CSA's disregard for individual rights and civil authority. The government proved that the two arsons constituted a "pattern" because they stemmed from the same or similar purposes, involved the same group of participants, and had similar methods of commission. The evidence also showed that there was every likelihood that such activities would continue indefinitely. We are satisfied that the government amply fulfilled its burden of showing a pattern of racketeering activity and its direct relationship to CSA as an enterprise.

 As regards the interstate travel offense under 18 U.S.C. § 1952(a)(3),[4] the government need only show that Ellison had the intent to carry on the illegal activity—here arson—which occurred in conjunction with interstate travel. *See United States v. Clark,* 646 F.2d 1259, 1268 n. 16 (8th Cir.1981). The evidence showed that while in Arkansas, Ellison planned to burn down the church in Springfield, Missouri, and later with other CSA members helped execute this plan. The carrying out of this arson required travel between Arkansas

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

**4.** Section 1952(a) prohibits in part "travel[ ] in interstate or foreign commerce or use[ ] [of]

any facility in interstate or foreign commerce, including the mail, with intent to ... (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity...."

and Missouri and thus violated 18 U.S.C. § 1952(a)(3). Based upon our review of the trial record, we are convinced the jury had sufficient evidence upon which to convict Ellison of violating section 1952(a)(3).

Ellison's convictions are affirmed.