865 F.2d 255
 27 Fed. R. Evid. Serv. 98
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Wayne Lee BATES, Defendant-Appellant.
 No. 88-5053.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 31, 1988.
Decided: Nov. 28, 1988.
 
 William Chalmers Leach (Kielkopf, Albert & Caldwell, P.C., on brief), for appellant.
 Richard Wilcox Pierce, Assistant United States Attorney (John P. Alderman, United States Attorney, Jennie L. Montgomery, Assistant U.S. Attorney, Martha E. Barber, Third Year Law Student, on brief), for appellee.
 Before JAMES DICKSON PHILLIPS and WILKINSON, Circuit Judges, and DENNIS R. KNAPP, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Wayne Lee Bates challenges his conviction for interstate transportation of a stolen motor vehicle and traveler's checks bearing forged countersignatures in violation of 18 U.S.C. Secs. 2312, 2314, and for conspiracy to commit these crimes in violation of 18 U.S.C. Sec. 371. His primary contention is that the district court denied him an adequate opportunity to present a complete psychiatric defense, but he also challenges his conviction on several evidentiary grounds. We conclude that the district court allowed Bates a fully adequate opportunity to assess his mental condition and that the court did not commit reversible error in admitting the contested evidence. Based on these conclusions, we affirm.
 
 
 2
 * Bates escaped from jail in Kentucky on July 20, 1986. He later confessed, in a separate proceeding, that on July 23 he murdered Julia Penrod Guida while she was on a business trip in Tennessee and stole her rental car and twelve American Express traveler's checks. The evidence in the present case shows that before Bates left Tennessee, he picked up two hitchhikers in Guida's car. The female hitchhiker testified that as the three drove through Virginia and on to Baltimore, Maryland, she forged Guida's name on the traveler's checks and cashed them as a "quid pro quo" for the ride Bates was giving her and her companion. Bates' latent fingerprints were later found on one of the cashed checks.
 
 
 3
 On July 26, 1986, police arrested Bates in Baltimore on an unrelated charge. At this point, Bates confessed to murdering Guida and led police to her body. In Tennessee, Bates pleaded guilty to first degree murder and to larceny of the traveler's checks and the rental car in a consolidated single-larceny charge. After sentencing on these charges in Tennessee, Bates was transferred to Virginia on the federal indictment involving the interstate transportation and conspiracy offenses. The federal proceeding progressed slowly, in part because Bates asked for and received psychiatric evaluation on his competency to stand trial and his state of mind at the time of the offenses. Bates was eventually evaluated in Springfield, Missouri at a federal facility and then again in Roanoke, Virginia. He had also undergone psychiatric evaluation in connection with the Tennessee proceedings.
 
 
 4
 At trial, the United States produced evidence that Guida purchased twenty $20 American Express traveler's checks and rented a Mercury Topaz shortly before her murder. Evidence also showed that Guida checked into the Holiday Inn on July 20 and stayed there until at least July 23. After being notified on July 27 that Guida was missing, a Tennessee investigator, Frankie Floyd, followed a trail of cashed traveler's checks bearing Guida's signature through Virginia into Maryland. Over Bates' objection that Floyd was not qualified as a fingerprint expert, the district court allowed Floyd to testify that investigators found a Luck's bean can with Bates' fingerprints on it near the site of Guida's disappearance in Tennessee. In response to Bates' renewed objection at the end of trial, the court issued a cautionary instruction, to which Bates agreed, telling the jury to disregard the testimony.
 
 
 5
 During trial, Bates also filed a motion in limine and later suggested a stipulation of fact--that Bates had Guida's traveler's checks and motor vehicle "without her permission"--in an attempt to preclude the introduction of evidence concerning Guida's murder and his own escapee status. Though the court never ruled on the requested motion and stipulation, it worked with counsel for both sides and fashioned a compromise: the United States could introduce the facts of Guida's death and Bates' escape only insomuch as they related to the elements of the federal offenses.
 
 
 6
 The government's last witness, an FBI special agent, testified that Guida's body was found in a wooded area near the Holiday Inn in Manchester, Tennessee, that she apparently had died from unnatural causes, and that his investigation had revealed no relation, romantic or otherwise, between Guida and Bates before July 23. The United States introduced no direct evidence that Bates killed Guida.
 
 
 7
 Bates presented no evidence in his defense. Out of the presence of the jury, however, he presented the testimony of a psychiatrist appointed to evaluate him. The psychiatrist testified that while Bates was mentally ill, he was not psychotic and that he made decisions weighing right and wrong when he killed Guida. The jury found Bates guilty of all counts. This appeal followed.
 
 II
 
 8
 Bates first contends that he was denied a full opportunity to present a complete psychiatric defense. He admits, however, that the district court did not abuse its discretion in handling his psychiatric requests in the manner in which it did. His principal complaint then is that he was unable to obtain an electroencephalogram (EEG) that employed a new mapping procedure, even though he had already obtained a standard EEG which revealed no abnormalities.
 
 
 9
 Bates' argument then is really miscast. While he is arguing that he was denied an adequate opportunity to present a defense, the facts suggest that his real argument is that he was denied "the opportunity to determine with expert help whether he had a defense worth presenting." United States v. Taylor, 437 F.2d 371, 379 n. 13 (4th Cir.1971). In Taylor, we faced a similar argument and ultimately determined that the district court had erred in refusing to appoint a psychiatrist to assist in the defendant's evaluation of an insanity defense. We rejected the defendant's request for a new trial, however, holding that the error did not necessarily require that the judgment be set aside. We reasoned that it was "entirely possible, despite the indications of mental difficulties, that a thorough examination would not have provided counsel with any meaningful assistance in preparing an insanity defense; it might even have led him to conclude that there was, in fact, no basis for one." 437 F.2d at 377. If that were true, we concluded, then the error would be harmless. Accordingly, we suspended the judgment and remanded to the district court with directions to appoint a psychiatrist to assist defense counsel. We directed that the judgment would be vacated and a new trial ordered only if the psychiatrist's report indicated "the existence of a substantial question of criminal responsibility, and if defense counsel represents that he intends to rely on it on retrial." Id.
 
 
 10
 Like Taylor, Bates claims he was denied an adequate opportunity to assess his defense. But, unlike Taylor, Bates was granted consultation after consultation with expert psychiatrists, psychologists, and neurologists. While Taylor clarifies that district courts must allow defendants a reasonable opportunity to evaluate a psychiatric defense, it certainly does not require that district courts afford defendants every opportunity they may request to develop a psychiatric defense. The record in the present case plainly reveals that Bates received sufficient assistance from the district court in assessing his psychiatric health. The record is replete with evidence of the court's awareness of the problem and its attempts to grant Bates' requests that were reasonable.
 
 
 11
 Before the federal trial, Bates had been examined by at least one neurologist, four psychiatrists, and two psychologists--but he chose to have none testify. In Tennessee, Bates was examined by both a state psychiatrist and a court-appointed psychiatrist to assist him in his defense. Tennessee also provided him with a neurological examination involving psychological testing, x-rays of the head, a CAT scan of the brain and spine, and an EEG.
 
 
 12
 At his federal arraignment, Bates moved the district court to commit him pursuant to 18 U.S.C. Sec. 4241 to determine his competency to stand trial and his competency at the time of the charged offenses. The court initially opposed the motion because of the recency of Bates' earlier evaluations in connection with the Tennessee proceedings but took the motion under advisement pending receipt of the Tennessee records and temporarily ordered that Bates be held for psychiatric evaluation by a local doctor. Later, when receipt of the documents and performance of the local psychiatric evaluation were long-delayed, the court ordered commitment to the federal facility in Springfield, Missouri pursuant to Sec. 4241 to determine Bates' competency.
 
 
 13
 The district court determined at a subsequent hearing that Bates was competent. It based its determination on the examining psychiatrist's report and on the observed behavior of Bates in the courtroom. During that hearing, Bates requested and received an independent psychiatrist to help him in the preparation of a psychiatric defense.
 
 
 14
 At Bates' request, the court also ordered the production of the original EEG report and actual tracing that was taken in Tennessee. Bates' Tennessee attorney complied with the Order by forwarding a copy of the EEG report and a copy of what he believed to be the actual tracing. Later the same month, the court granted Bates' requests to appoint a psychologist and neurologist to assist Bates in his defense and to order (at government expense) the psychiatric testimony from Tennessee. Because of the delay in accumulating all of this information, the court also granted Bates' motion for a continuance.
 
 
 15
 Because Bates continued to have difficulty obtaining his original EEG tracing, the court issued two more Orders in attempts to obtain it. Bates' counsel said that he had spoken with the Tennessee neurologist, however, who indicated that the tracing was within normal range. His counsel also reported that Bates' court-appointed psychiatrist, Dr. Daum, indicated that he would not support an insanity defense. Dr. Daum also testified that he believed Bates was making "right and wrong" decisions at the time of the offenses.
 
 
 16
 At Bates' sentencing hearing, a doctor from the Medical Center for Federal Prisoners at Springfield, Missouri, to which Bates earlier had been sent pursuant to 18 U.S.C. Sec. 4241, testified that Bates had refused a neurological exam involving a CAT scan of the brain, an EEG and a neurological evaluation. He also testified that he believed Bates knew right from wrong.
 
 
 17
 By this time, Bates had undergone a new EEG at Roanoke (not with the new procedure) which was consistent with the earlier one performed in connection with the Tennessee proceedings. The neurologist reported that he did not find any neurological signs which would substantiate Bates' suspicion of an organic personality disorder.
 
 
 18
 In light of all of these evaluations, which found nothing to support Bates' belief that he was suffering from an organic personality disorder, we simply cannot conclude that the district court's failure to provide Bates with yet another evaluation deprived him of an opportunity to present a complete psychiatric defense. We therefore reject Bates' challenge to his conviction on these grounds.
 
 
 19
 Bates also presents a subsidiary argument, however, with respect to the development of his psychiatric defense. He claims that the court-appointed psychiatrist, Dr. Daum, was unable to testify favorably on an insanity defense because of a conflict of interests. This challenge also lacks merit. While Dr. Daum had once evaluated the female hitchhiker who was going to testify as a government witness in Bates' trial, this conflict did not prejudice Bates' situation. Dr. Daum testified that while the conflict somewhat affected his normal routine, in that he severed direct contact with Bates' independent psychologist and neurologist, which necessitated using Bates' counsel as a go-between, it did not in any way affect his evaluation of Bates. Moreover, although aware of the conflict at the time, Bates did not request appointment of a new psychiatrist.
 
 III
 
 20
 Bates next objects to the introduction of evidence regarding the discovery of his fingerprints on a Luck's bean can near Manchester, Tennessee. He contends that admitting this evidence in the absence of expert testimony regarding the validity of the fingerprints denied him his sixth amendment right to confront witnesses against him. Bates further argues that the testimony was the only direct evidence linking him to Manchester--the town in which Guida's murder occurred; therefore, there is a "reasonable possibility that the improperly admitted evidence contributed to the conviction." Schneble v. Florida, 405 U.S. 427, 432 (1972).
 
 
 21
 The court's decision to allow the evidence without requiring additional expert testimony was in error. This does not mean, however, that it is reversible error. In United States v. Nyman, 649 F.2d 208 (4th Cir.1980), we determined that, in reviewing error:
 
 
 22
 the appropriate test of harmlessness ... is whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." In applying this test it is important to keep in mind that it does not ask whether we believe that irrespective of the error there was sufficient evidence to convict, but whether ... we believe it "highly probable that the error did not affect the judgment."
 
 
 23
 Id. at 211-12 (citations omitted). To apply this test to the record of "all that happened," we look at "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." Gaither v. United States, 413 F.2d 1061, 1079 (D.C.Cir.1969) (footnotes omitted).
 
 
 24
 The present case is not close. Although the "bean can" testimony may be the only direct evidence of Bates' link to Manchester, there is significant circumstantial evidence linking him. Moreover, the evidence does not go to a "central" issue. Bates' whereabouts before meeting the hitchhikers and traversing state lines is probative only of his opportunity to steal Guida's rental auto and traveler's checks, and "opportunity"--while certainly relevant to the government's case--was not one of the central issues that was being contested. Finally, the district court took proper steps to minimize the potential damage that erroneously admitted evidence may cause. At defense counsel's request, the court issued a cautionary instruction, advising the jury to disregard both the question and the response concerning the presence of Bates' fingerprints on the bean can in Manchester.
 
 
 25
 Because of the relative insignificance of the contested testimony and the district court's curative cautionary instruction, we are convinced that there is no "reasonable possibility that the improperly admitted evidence contributed to the conviction." Schneble, 405 U.S. at 432.
 
 IV
 
 26
 Bates next challenges the admission of evidence concerning his escapee status and Guida's murder. He moved the court pretrial for a limiting instruction, prohibiting the government from introducing any evidence on either of the subjects. He argued that the evidence was not necessary to prove the elements of the charged offense and was substantially more prejudicial than probative. In his motion, Bates also offered to stipulate that possession of the rental car and the traveler's checks belonging to Guida was "without her permission." The court determined that the government had a right to introduce evidence which helped prove its case but limited the evidence by excluding the details of Guida's death and any direct reference to Bates' involvement in her murder.
 
 
 27
 Bates' initial challenge on relevance grounds fails. The evidence easily satisfies the liberal test under Rule 401 of the Federal Rules of Evidence--it tends to make facts in issue more probable. The evidence contested is probative of knowledge, motive, intent, and opportunity, each of which was part of the government's case. See 18 U.S.C. Secs. 371, 2312, 2314.
 
 
 28
 Bates more strongly challenges the admission of the evidence on the ground that its probative value is outweighed by its prejudicial impact. He argues that the court should have forced the government to accept his proffered stipulation. Generally, the government is not obligated to accept a defendant's offer to stipulate to facts in issue. See United States v. Ellison, 793 F.2d 942, 949 (8th Cir.1986). "The rationale for [such a rule] is to enable the government to present to the jury a complete picture of the events constituting the crime charged." Id. The rule, however, is still subject to Federal Rule of Evidence 403 which excludes evidence that is more prejudicial than probative. Therefore, some courts require that the government accept the stipulation if the evidence it excludes in context would be unduly prejudicial. Id. (citing United States v. DeJohn, 638 F.2d 1048, 1053 (7th Cir.1981)).
 
 
 29
 The district court is accorded wide deference in making Rule 403 determinations. United States v. MacDonald, 688 F.2d 224, 227 (4th Cir.1982). "[A]bsent extraordinary circumstances, the Courts of Appeal will not interfere in [the trial judge's] resolution." Id. at 227-28. Therefore, our review must be light and the district court's initial application of Rule 403 need not be heavy-handed.
 
 
 30
 Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.
 
 
 31
 United States v. Meester, 762 F.2d 867, 875 (11th Cir.1985) (quoting United States v. McRae, 593 F.2d 700, 707 (5th Cir.1979)).
 
 
 32
 Even if the court should have forced acceptance of the stipulation, the circumstances presented here do not reflect the "extraordinary circumstances" which call for reversal. The district court was fully aware of the potential dangers of admitting the evidence which the stipulation would have excluded, carefully limited the scope of that which could be proffered, and gave appropriate limiting instructions to the jury on that which was admitted. We are convinced that this evidence, in the manner in which it was allowed to be introduced, was not substantially more prejudicial than probative. See Meester, 762 F.2d at 875 (holding that introduction of evidence of murder in drug conspiracy case not unduly prejudicial).
 
 V
 
 33
 Bates' final challenge to his conviction is without merit. He claims that the fifth amendment's double jeopardy clause prohibits the government from prosecuting him for virtually identical offenses in both the state and federal sovereigns. Of course it does not. See United States v. Lanza, 260 U.S. 377, 382 (1922) ("An act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each."); United States v. Iaquinta, 674 F.2d 260, 264 (4th Cir.1982).
 
 
 34
 AFFIRMED.